**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) NON-ARTERITIC ISCHEMIC OPTIC NEUROPATHY PRODUCTS LIABILITY LITIGATION | MDL NO. 3163<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| DAVID TULTZ,<br>Plaintiff,<br><br>v.<br><br>ELI LILLY AND COMPANY and LILLY USA, LLC,<br>Defendants. | COMPLAINT AND JURY DEMAND<br><br>CIVIL ACTION NO.: 2:26-cv-7795 |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections and privileges, and obligations of that Direct Filing Order and other Orders of the Court. Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the Western District of Michigan as Plaintiff's designated venue ("Original Venue"). Plaintiff makes this selection based upon one (or more) of the following factors (check the appropriate box(es)):

_X_ Plaintiff currently resides in Vicksburg, Michigan (City/State).

_X_ Plaintiff purchased and used Defendant(s)' products in Vicksburg, Michigan (City/State).

__ The Original Venue is a judicial district in which Defendant __________ resides, and all Defendants are residents of the State in which the district is located (28 USC § 1391(b)(1)).

_X_ The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically (28 USC § 1391(b)(2)): ____________________.

__ There is no district in which an action may otherwise be brought under 28

USC § 1391, and the Original Venue is a judicial district in which Defendant _______________ is subject to the Court's personal jurisdiction with respect to this action (28 USC § 1391(b)(3)).

__ Other reason (please explain):______________________________________.

## NATURE OF THE CASE

Plaintiff, David Tultz, by and through the undersigned counsel, brings this complaint against Defendants Eli Lilly and Company and Lilly USA, LLC for damages suffered by David Tultz, who was severely injured as a result of using Defendants' Mounjaro, an injectable prescription medication designed, researched, tested, manufactured, marketed, supplied, promoted, advertised, packaged, labeled, sold and/or distributed by Defendants to improve blood sugar (glucose) in adults with type 2 diabetes. In support thereof, Plaintiff alleges as follows:

## PARTY PLAINTIFF

1. At all relevant times hereto, Plaintiff David Tultz is a citizen of the United States and a resident of the State of Michigan.

2. Plaintiff is 59 years of age.

3. Plaintiff was prescribed and used Mounjaro from January 2023 to September 2023, as directed by his physicians.

4. In or around October of 2024, after experiencing vision loss in his right eye, Plaintiff was diagnosed with non-arteritic anterior ischemic optic neuropathy (NAION).

5. As a result of his use of Mounjaro, Plaintiff was caused to suffer from NAION and its sequalae, including blindness and blurry and/or darkened vision, leading to physical and emotional injuries and radical changes to his lifestyle given his loss of sight.

6. As a result of using Mounjaro, Plaintiff was caused to suffer from the injuries identified above and, as a result, sustained severe personal injuries, pain, suffering, and emotional

distress and incurred medical expenses.

**PARTY DEFENDANTS**

7. Defendant Eli Lilly and Company is and at all relevant times has been an Indiana corporation with a principal place of business at Lilly Corporate Center, 893 S. Delaware St., Indianapolis, Indiana.

8. Defendant Lilly USA, LLC is and at all relevant times has been an Indiana LLC with a principal place of business at Lilly Corporate Center, 893 S. Delaware St., Indianapolis, Indiana, with at least one member who is a citizen of Indiana.

9. Defendants Eli Lilly and Company and Lilly USA, LLC are referred to collectively herein as "the Eli Lilly Defendants" or "Eli Lilly" or "Lilly."

10. Each of the Eli Lilly Defendants was the agent and employee of the other Eli Lilly Defendants and, in doing the things alleged, was acting within the course and scope of such agency and employment and with the other Eli Lilly Defendants' actual and implied permission, consent, authorization and approval.

11. In collaboration amongst themselves, as part of their business, and at all relevant times, the Eli Lilly Defendants designed, researched, manufactured, tested, labeled, advertised, promoted, marketed, sold, and/or distributed GLP-1 RAs, including Mounjaro.

**INTRODUCTION**

12. Mounjaro belongs to a class of drugs called GLP-1 receptor agonists ("GLP-1 RAs"). The active ingredient in Mounjaro is known as tirzepatide. Other drugs and active ingredients, including Ozempic and Wegovy (semaglutide) and Trulicity (dulaglutide) also fall within the GLP-1 RA class, based on similarities in their mechanisms of action, physiologic effects, and chemical structure.

13. Medications within the GLP-1 RA class of drugs mimic the activities of physiologic GLP-1, a gut hormone that binds to receptors throughout the body and, notably, activates GLP-1 receptors in the pancreas to stimulate the release of insulin and suppress glucagon.[1]

14. GLP-1 RAs are designed to work similarly, to stimulate insulin production and reduce glucose production, but engineered to last longer than naturally occurring GLP-1, which has a short life and is quickly metabolized by enzymes.

15. GLP-1 RAs are prescribed, for certain patient populations, to improve blood sugar in adults with type 2 diabetes, reduce cardiac risk, and/or aid in chronic weight management.

16. Defendants have acknowledged that gastrointestinal events are well known side effects of the GLP-1 RA class of drugs.[2] However, Defendants have downplayed the nature, duration, extent, and seriousness of gastrointestinal events and failed to warn about other adverse events caused by their GLP-1 RAs, even serious and devastating effects, including NAION and its sequalae, which can result in blindness and permanent vision loss, as well as blurry and/or darkened vision, which may lead to falls and other injuries.

17. The decision to target the American population for the sale of Defendants' GLP-1 RAs was not accidental. Defendants understood the vast financial potential of marketing medications for weight loss in the United States, where obesity rates were on the rise despite the culture's obsession with losing weight and being thin.

18. Defendants set on a course to create and expand the market for weight-loss medication(s) by, among other things, advocating for obesity to be classified as a disease and

[1] D. Hinnen, Glucagon-Like Peptide 1 Receptor Agonists for Type 2 Diabetes, 30(3) DIABETES SPECTR. 202-10 (Aug. 2017), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5556578/.
[2] See, e.g., CT Jones, Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell", Rolling Stone (July 25, 2023), available at https://www.rollingstone.com/culture/culture-news/ozempic-stomach-paralysis-weight-loss-side-effects-1234794601 (last visited on 9/26/23).

thereby expanding the market for their drugs, spending hundreds of millions of dollars in an effort to change the medical consensus on how to treat obesity, implementing cutting-edge invasive, unprecedented and multifaceted marketing campaigns that were so effective they engrained these drugs in the pop culture zeitgeist, and spending untold millions in an effort to get weight-loss medications covered under public and private insurance. Defendants engaged in this conduct even before GLP-1 RAs were approved for weight loss, encouraging extensive off-label demand for and use of GLP-1 RAs.

19. By undertaking that effort, Defendants also were systematically and intentionally targeting users of other diabetes medications. Defendants' promise of weight loss wrongfully enticed users of other diabetes medications to switch to a GLP-1 RA, although they never would have done so if not for the off-label promotion of those drugs.

20. Defendants also sought to make the GLP-1 RAs more accessible by, among other things, marketing through telemedicine where the criteria for qualifying for the drugs, *e.g.*, Body Mass Index ("BMI"), are more easily manipulated.

21. Defendants' efforts to conceal (or minimize) the risks associated with taking their drugs were intended to create the impression that these were "miracle drugs" to help users lose weight. However, Defendants never disclosed that many people who take these drugs stop taking them because of the drastic side effects (thereby never achieving weight loss or any health benefit allegedly associated with the drug(s)); the drugs do not result in meaningful weight loss for up to 15% of people;[3] the average weight loss for someone taking the drugs is a modest 10.09% of the person's body weight;[4] and a person will need to stay on these drugs for the rest of their lives to

---

[3] Erica Carbajal, *Up to 15% of patients on weight loss drugs may be 'non-responders'*, BECKER'S HOSPITAL REV. (Apr. 1, 2024) available at https://www.beckershospitalreview.com/glp-1s/upto-15-of-patients-on-weight-loss-drugs-non-responders.html.
[4] Gao, et al., *Efficacy and safety of semaglutide on weight loss in obese or overweight patients without diabetes: A*

maintain the weight loss.[5] What is worse, Defendants kept this information hidden while actively degrading trust in the prevailing view that lifestyle changes like proper nutrition and exercise were the keys to health and can accomplish long-lasting weight loss and management for most people.

22. The efforts to engrain GLP-1 RAs such as Ozempic, Wegovy, Mounjaro, Zepbound, and Trulicity in the public conscious, to manipulate the medical community's views on obesity treatment, and to make the drugs more accessible acted as a launching pad for the explosive growth of the GLP-1 RAs, both for people with diabetes, and for people seeking to lose weight, whether they were using the drug as prescribed or off-label. Plaintiff would not have taken GLP-1 RAs if Plaintiff had been provided a full and clear warning of the true risks of taking these drugs.

23. Defendants' efforts to expand and grow the markets for treatment of diabetes and weight loss, whether off-label or not, worked. The U.S. GLP-1 RA market is expected to exceed $100 Billion by 2030 with total U.S. users comprising about 9% of the population.[6] This growth is a tremendous boon to GLP-1 RA makers but comes at a significant cost. Financially, it is expected that their lobbying efforts will pay off, and GLP-1 RAs may get added to prescription drug coverage under Medicare Part D in the coming years. Some analysts project that this will add $13.6 to $26.8 Billion to Medicare Part D expenses even if only 10% of people with obesity use them, causing a significant shift in premiums and coverage in other areas.[7]

24. The outsized growth of the market for GLP-1 RAs also means that the patient base has expanded to include many patients who would be better served choosing alternate treatment

*systematic review and meta-analysis of randomized controlled trials*, FRONTIERS IN PHARMACOLOGY 1 (2022).

[5] Wilding, et al., *Weight regain and cardiometabolic effects after withdrawal of semaglutide: The STEP 1 trial extension*, 24 DIABETES OBES METAB. 1553, 1562 ("[T]reatment withdrawal led to most of the weight loss being regained within 1 year, …, reinforcing the need for continued treatment to maintain weight loss ….").

[6] J.P. Morgan Research, *The increase in appetite for obesity drugs* (Nov. 29, 2023), available at https://www.jpmorgan.com/insights/global-research/current-events/obesity-drugs#sectionheader#0.

[7] Vanderbilt University Medical Center, *Cost of covering antiobesity drugs could be billions to Medicare despite, a new analysis finds* (Mar. 15, 2023), available at https://www.vumc.org/health-policy/medicare-antiobesity-medications-nejm.

paths. Defendants' marketing campaigns have altered the public understanding of weight loss treatment, creating the impression that GLP-1 RAs are not just one tool among many available to doctors, but are instead "miracle drugs." But, these patients, like Plaintiff, were lured into a false sense of hope that GLP-1 RAs would guarantee results and be efficacious and safe. Plaintiff and other users injected themselves with GLP-1 RAs believing that they were doing something to promote their health when, in fact, it had the opposite effect.

25. As a result of the foregoing, Plaintiff has suffered and was diagnosed with injuries that were directly and proximately caused by regular and prolonged use of Mounjaro. Plaintiff's injuries include, but are not limited to, NAION and its sequalae.

26. Upon information and belief, Defendants failed to warn physicians and the end users of Mounjaro of the complications and devastating effects of which the companies knew or should have known, including NAION, which can result in blindness and permanent vision loss.

27. Upon information and belief, Defendants failed to warn the end users of Mounjaro of the complications and devastating effects of which the company knew or should have known.

28. Upon information and belief, Defendants' marketing was deceptive and misleading about the true risks associated with the use of Mounjaro, risks which the companies knew or should have known.

29. At all relevant times, Defendants conducted business and derived substantial revenue from its marketing, advertising, distributing, and selling of GLP-1 RAs, including Mounjaro, within Michigan.

## <u>FACTUAL ALLEGATIONS</u>

### A. Introduction to GLP-1 and GLP-1 RA Products

30. Researchers first discovered GLP-1 in hamsters in 1983.[8] It is a hormone that helps regulate blood sugar, appetite, and digestion in animals, including humans; and is produced naturally in the brain and intestinal wall of humans.

31. In 1993, researchers discovered that a peptide from the venom of gila monsters activated GLP-1 receptors.[9] Gila monsters can go for months without eating but maintain stable blood sugar levels because they make very high levels of a glucagon peptide called exendin-4. Thus, the gila monster served as the inspiration for the GLP-1 RA class of drugs.

32. Following the discovery that exendin-4 is similar in structure to GLP-1, a synthetic version of exendin-4 was developed to treat diabetes. This became the first GLP-1 drug, known as Byetta, with the active ingredient exenatide, which came to market in 2005. Byetta was initially brought to market as a collaboration between Eli Lilly and Amylin.[10] Whereas naturally-occurring GLP-1 has a short half-life of just a few minutes, Byetta's half-life was noted to be 2.4 hours.[11]

33. Simultaneously with the development of exenatide, another company, Novo Nordisk (herewithin "Novo") was developing another GLP-1 drug called liraglutide. In the early 1990s, Novo researchers discovered that when they injected liraglutide into rats, it caused them to stop eating almost entirely.[12] Liraglutide came to market in 2010, marketed initially as Victoza and later as Saxenda. Liraglutide has a half-life of 13-15 hours.[13]

---

[8] Bell, et al., *Hamster preproglucagon contains the sequence of glucagon and two related peptides*, 302 NATURE 716 (1983).

[9] Thorens, et al., *Cloning and functional expression of the human islet glp-1 receptor*, 42 DIABETES 1678 (1993).

[10] News Release: Amylin and Lilly Announce FDA Approval of BYETTA(TM) (Exenatide Injection) (Apr. 29, 2005), *available at* https://investor.lilly.com/news-releases/news-releasedetails/amylin-and-lilly-announce-fda-approval-byettatm-exenatide (last visited Nov. 8, 2023) (describing the drug as a "collaboration" between Amylin and Lilly).

[11] Cai, et al., *Long-acting preparations of exenatide,* DRUG DES. DEVEL. THER. (Sept. 2013).

[12] Gina Kolata, *We Know Where New Weight Loss Drugs Came From, but Not Why They Work*, NEW YORK TIMES (Aug. 17, 2023), available at https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html.

[13] Rubino, et al., *Effect of Weekly Subcutaneous Semaglutide vs Daily Liraglutide on Body Weight in Adults with Overweight or Obesity without Diabetes: The STEP 8 Randomized Clinical Trial,* JAMA (Jan. 2022).

34. Various active ingredients fall within the GLP-1 RA class of drugs, including semaglutide (marketed by Novo as Ozempic, Wegovy, and Rybelsus), liraglutide (marketed by Novo as Saxenda, Victoza, and in combination with insulin as Xultophy 100/3.6), tirzepatide (marketed by the Lilly as Mounjaro and Zepbound), dulaglutide (marketed by Lilly as Trulicity), exenatide (marketed by various companies as Byetta, Bydureon, and Bydureon BCise), albiglutide (marketed by GlaxoSmithKline as Tanzeum), and lixisenatide (marketed by Sanofi as Adlyxin and in combination with insulin as Soliqua 100/33). The U.S. Food & Drug Administration ("FDA") recognizes GLP-1 RAs as a class of drugs based on similarities in their mechanisms of action, physiologic effects, and chemical structure.[14] Defendants likewise recognize that their GLP-1 RAs are members of the same class.[15]

35. Medications within the GLP-1 RA class of drugs mimic the activities of physiologic GLP-1 in numerous ways,[16] including attaching to GLP-1 receptors, sending various signals in the body, triggering a sensation of satiety (or perception of fullness, thereby curbing users' appetites and decreasing intake of calories and nutrients),[17] acting on the pancreas to stimulate the release of insulin, suppressing the release of glucagon, and slowing or inhibiting gastric emptying and intestinal motility.

---

[14] *See* FDA Ozempic Summary Review, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/209637Orig1s000SumR.pdf at 8 (including liraglutide, dulaglutide, and semaglutide in the GLP-1 RA class) (last visited Jan. 2, 2025); *see also* FDA Mounjaro Clinical Review, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2022/215866Orig1s000MedR.pdf at 52 (results of tirzepatide toxicology studies in animals were typical of the GLP-1 RA pharmacologic class) (last visited Jan. 2, 2025); *see also* https://www.fda.gov/industry/structuredproductlabeling-resources/pharmacologic-class (last visited Dec. 28, 2023).

[15] SURMOUNT-1 Clinical Trial Protocol at 45, available at https://cdn.clinicaltrials.gov/largedocs/22/NCT04184622/Prot_000.pdf ("General safety characteristics of all studied doses of tirzepatide were similar to those of the GLP-1R agonist class…"); STEP-1 Clinical Trial Protocol at 15, accessible at https://cdn.clinicaltrials.gov/large-docs/35/NCT03548935/Prot_002.pdf ("[T]he tolerability and safety profile [of semaglutide] was overall consistent with… the GLP-1 RA class in general.").

[16] Cleveland Clinic, *GLP-1 Agonists* (Jul. 3, 2023), available at https://my.clevelandclinic.org/health/treatments/13901-glp-1-agonists.

[17] *See* Bloemendaal, et al., *Effects of glucagon-like peptide 1 on appetite and body weight: focus on the CNS,* J. ENDOCRINOLOGY (Apr. 2014).

36. In contrast to naturally-occurring GLP-1, which has a short life and is quickly metabolized by enzymes, GLP-1 RAs are engineered to last longer, as previously noted. The chemical structure of GLP-1 RAs includes a fatty chain that inhibits such quick dissolution. GLP-1 RAs such as semaglutide have a long half-life of well over 100 hours, causing the drugs to stay in the body for a month or more after the last dose.

37. The GLP-1 RA at issue in this case, Mounjaro, is a weekly injectable drug.

**B. The Regulatory History of Mounjaro**

38. On September 14, 2021, Eli Lilly submitted New Drug Application ("NDA") 215866 Mounjaro (tirzepatide) injection as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus. On May 13, 2022, the FDA approved NDA 215866. [18]

39. On May 13, 2022, Eli Lilly announced the FDA's approval of NDA 215866. In the press release, Eli Lily disclosed a safety summary and provided a link to the Medication Guide and Prescribing Information, but NAION was not identified as a risk.

**C. The Medical Literature and Clinical Trials Gave Defendants Notice of NAION and its Sequalae Being Causally Associated with GLP-1 RAs.**

40. NAION is a medical condition involving damage to the optic nerve resulting in the loss of vision.

41. NAION is irreversible and permanent.

42. NAION falls within the category of an eye stroke.

43. NAION is untreatable and can lead to permanent blindness.

44. While the precise cause of NAION is unknown, the general belief among the

[18] FDA Approval Letter for NDA 215866 (Mounjaro) available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/215866Orig1s000ltr.pdf (last visited on 8/24/23).

medical community is that the condition is caused by insufficient blood supply or ischemia to the optic nerve.

45. Typically, NAION patients present with acute, painless vision loss in one eye that is often described as blurry or cloudy while 8-12% of patients may have accompanying pain such as a headache or periocular pain.

46. The vision loss may occur over hours to days, but generally NAION patients notice vision loss or even total blindness upon waking in the morning.

47. After glaucoma, NAION is the second most common cause of blindness due to optic nerve damage.

48. Some NAION patients lose complete vision with no recovery in affected eye(s).

49. Reduced or loss of vision has a detrimental impact on a person's day-to-day life. Many NAION patients cannot drive or have driving restrictions, cannot read or have trouble reading, and may be unable to continue in their line of employment. Being blind in one eye, and certainly both eyes, results in bumps and falls and injuries related to the unseen impacts and accidents.

50. Patients with NAION suffer from blurred or darkened vision obstructing their field of view, as well as loss of color vision and loss of contrast in vision.[19]

51. About 15% of patients who have NAION in one eye eventually develop it in their other eye.[20]

52. GLP-1 RAs are treated as an established pharmacologic class (EPC) by the FDA, and the class of drugs shares a similar mechanism of action, similar physiologic effects, and similar

[19] *Ischemic Optic Neuropathy,* Cleveland Clinic, (last reviewed 6/30/2024), available at https://my.clevelandclinic.org/health/diseaes/ischemic-optic-neuropathy
[20] *Id.*

chemical structure.

53. It has been known since at least 2016 that the human eye contains GLP-1 receptors.[21]

54. Defendants knew or should have known of the causal association between the use of Mounjaro and the risk of developing NAION and its sequelae, but they ignored it.

55. The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischemic Neuropathy" reported in connection with the use of GLP-1 RAs.

56. The earliest reported Optic Ischemic Neuropathy event associated with any GLP-1 RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[22]

57. A meta-analysis of all clinical trials of GLP-1RA drugs, including Novo Nordisk's own clinical trials, found a non-statistically significant increased risk of optic ischemic neuropathy.[23]

58. The authors note that optic ischemic neuropathy is rare and may have been underreported in clinical trials, leading to a lower estimated risk.[24]

59. The overall rate of optic ischemic neuropathy was higher in the treatment group than the control group: 5.6 and 3.0 cases per 100,000 patient-years, respectively. The authors also note that "inappropriate use of drugs for inducing weight loss in moderately overweight patients with low cardiovascular risk could be associated with rare, but severe, adverse effects, possibly

[21] Hernández C et al, Topical Administration of GLP-1 Receptor Agonists Prevents Retinal Neurodegeneration in Experimental Diabetes, DIABETES 2016 Jan;65(1):172-87. doi: 10.2337/db15-0443. Epub 2015 Sep 17. PMID: 26384381.
[22] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.
[23] Silverii GA et al, Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy. A meta-analysis of randomised controlled trials, Diabetes Obes Metab, 2024 (available as a pre-print manuscript as of November 20, 2024), https://dom-pubs.pericles-prod.literatumonline.com/doi/10.1111/dom.16076.
[24] *Id.*

including NAION.[25]

60. A Novo Nordisk spokesperson acknowledged that cases of NAION, which leads to severe and irreversible vision loss, were identified in Novo Nordisk's clinical trials.[26]

61. Defendants knew or should have known of the risk of NAION with use of Mounjaro.

62. Defendants conduct clinical trials and have access to case reports and medical literature that provide them with superior knowledge compared to the general public as to potential risks of their medications.

63. For example, a clinical trial entitled "A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes (SUSTAIN FORTE)" with results first submitted in August 2021, involved a participant who developed optic ischemic neuropathy which was categorized as a serious adverse event.[27]

64. The event occurred within the Semaglutide 2.0 mg dosage group, which included 479 participants, which is significant given the low background incidence of NAION.[28]

65. Clinical observations by astute neuro-ophthalmologists at the Harvard affiliated Massachusetts Eye and Ear ("Mass Eye and Ear") who noted a surge of NAION cases amongst patients on Ozempic led them to conduct a retrospective, matched cohort study of neuro-ophthalmic patients at Mass Eye and Ear, Boston.

---

[25] *Id.*

[26] Kevin Dunleavey, After studies flag possible link between Novo's Ozempic and rare eye disorder, Danish agency calls for probe, Fierce Pharma, (December 17, 2024), available at https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness (last visited 12/18/2024); See also Naomi Kresge, Ozempic Link to Rare Vision Loss Risk Confirmed in Study, Bloomberg, (December 13, 2024), available at https://www.bloomberg.com/news/articles/2024-12-13/ozempic-link-to-rare-vision-loss-risk-confirmed-in-large-trial?leadSource=uverify%20wall (last visited 12/18/2024).

[27] A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes (SUSTAIN FORTE). ClinicalTrials.gov identifier: NCT03989232. Updated February 13, 2023. Accessed February 18, 2025.

[28] *Id.*

66. The study "Risk of Nonarteric Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide", authored by Hathaway *et al.*, involved patients examined in the neuro-ophthalmology clinic between December 1, 2017, and November 30, 2023, and consisted of 17,298 patients, including 16,827 patients over the age of 12, 710 of which had type 2 diabetes (T2D), and 979 were overweight or obese.[29]

67. Of the 710 T2D patients, 194 patients were prescribed semaglutide and 516 were prescribed other non-GLP-1 RA antidiabetic medications.[30]

68. Of the 979 overweight/obese patients, 361 were prescribed semaglutide and 618 were prescribed other non-GLP-1 RA anti-obesity medications.[31]

69. Within the T2D study population, NAION occurred in 17 patients in the semaglutide cohort vs. 6 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 8.9% (95% CI, 4.5%-13.1%) for the semaglutide cohort vs 1.8% (95% CI, 0%-3.5%) for the nonsemaglutide cohort and the Cox proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 4.28; 95% CI, 1.62-11.29; $P < .001$; concordance coefficient = 0.84).[32]

70. Within the overweight/obese cohort, NAION occurred in 20 patients in the semaglutide cohort vs. 3 in the non-GLP-1 RA cohort. The Kaplan-Meier survival analysis at 36 months showed a cumulative incidence of NAION of 6.7% (95% CI, 3.6%-9.7%) for the semaglutide cohort vs 0.8% (95% CI, 0%-1.8%) for the nonsemaglutide cohort and the Cox

[29] Hathaway JT, Shah MP, Hathaway DB, et al. Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide. JAMA Ophthalmol. 2024;142(8):732–739. doi:10.1001/jamaophthalmol.2024.2296
[30] *Id.*
[31] *Id.*
[32] *Id.*

proportional hazards regression model showed a higher NAION risk in the semaglutide cohort vs the nonsemaglutide cohort (HR, 7.64; 95% CI, 2.21-26.36; P < .001; concordance correlation coefficient = 0.86).[33]

71. The primary outcome of the Hathaway *et al.* study is that use of Ozempic is associated with an increased risk of NAION. "The relatively high HRs (4.28 and 7.64 for our T2D and overweight or obese cohorts, respectively) identified by our Cox regression analyses reveal a substantially increased risk of NAION among individuals prescribed semaglutide relative to those prescribed other medications to treat T2D and obesity or overweight."[34]

72. Acknowledging the pathogenesis or cause of NAION remains unknown. The authors did not determine the mechanism in which semaglutide causes NAION, however, it was hypothesized that expression of the GLP-1 receptor in the optic nerve and GLP-1 RA–induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION.[35]

73. A meta-analysis of all clinical trials of GLP-1 receptor drugs, including Defendants' own clinical trials, found a non-statistically increased risk of optic ischemic neuropathy.[36] Because optic ischemic neuropathy is rare, the authors note there may have been underreporting in the clinical trials, leading to a lower estimated risk.[37] However, the study concluded the overall rate of optic ischemic neuropathy was higher in the GLP1-RA group compared to the placebo group: 5.6 and 3.0 cases per 100,000 patient-years, respectively which is

---

[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] Silverii GA, Pala L, Cresci B, Mannucci E. Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy: A meta-analysis of randomised controlled trials. *Diabetes Obes Metab*. 2025; 27(2): 1005-1009. doi:10.1111/dom.16076
[37] *Id.*

nearly a doubling of the risk.[38]

74. On December 11, 2024, a pre-print of an article entitled "Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish- Norwegian cohort study", found an association between use of semaglutide for type 2 diabetes.[39]

75. This cohort study compared the risk of NAION among individuals with type 2 diabetes using semaglutide compared to those using sodium-glucose co-transporter 2 inhibitors (SGLT-2s), another diabetes medication.[40] The authors concluded there is "an association between use of semaglutide for type 2 diabetes and risk of NAION, with a more than two-fold increased hazard ratio."[41]

76. In a registry-based prospective cohort study identifying 424,152 patients diagnosed with type 2 diabetes in Denmark between December 1, 2018, and December 31, 2023,[42] 106,454 of these patients were exposed to semaglutide and 67 developed NAION.[43]

77. "Exposure to once weekly semaglutide was followed by 67 events of NAION during 294,395 years of observation as compared to 151 events during the 1,620,725 years of observation for non-exposed."[44]

78. The study concluded use of semaglutide "more than doubles the risk of NAION, even when multiple other factors have been taken into account."[45]

79. Interestingly, the study also observed that "after the introduction of once-weekly

---

[38] *Id.*
[39] Simonsen E, Lund LC, Ernst MT, et al. Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish–Norwegian cohort study. Published online December 11, 2024. doi:10.1101/2024.12.09.24318574
[40] *Id.*
[41] *Id.*
[42] Grauslund J, Taha AA, Molander LD, et al. Once-weekly semaglutide doubles the five-year risk of nonarteritic anterior ischemic optic neuropathy in a Danish cohort of 424,152 persons with type 2 diabetes. *Intl. Journal of Retina and Vitreous*. 2024;10(1):97. doi:10.1186/s40942-024-00620-x
[43] *Id.*
[44] *Id.*
[45] *Id.*

semaglutide in Denmark in November 2018, the annual number of first-time NAION episodes reached an all-time high for the years 2019-2023.[46]

80. Due to the findings of the two studies out of Denmark, as of January 17, 2025, the Pharmacovigilance Risk Assessment Committee (PRAC) of the Danish Medicines Agency has required Novo Nordisk to review and submit available data related to semaglutide and NAION. The PRAC will review and determine if a label change is warranted or if other risk minimization efforts should be pursued.[47]

81. In response, Novo Nordisk has acknowledged cases of NAION were identified within their clinical trials.[48]

82. A recent case series published by Katz *et al.*, "Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide," also examined nine patients taking GLP1-RA medications who had experienced ophthalmologic complications. Of the nine patients, seven developed NAION.[49]

83. The Katz article included a report of a woman with type 2 diabetes taking insulin and semaglutide and evidence of positive challenge and rechallenge with semaglutide.[50]

84. The morning after the patient's first injection of semaglutide, she experienced painful vision loss in her left eye and was diagnosed with bilateral optic nerve swelling and the initial impression was optic neuritis with poor recovery. She discontinued the medication only to start it again approximately two months later after which she experienced painful vision loss in her

[46] *Id*.
[47] https://laegemiddelstyrelsen.dk/en/news/2024/suspicion-of-rare-eye-condition-from-ozempic-use-to-be-investigated-further/
[48] https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness
[49] Katz BJ, Lee MS, Lincoff NS, et al. Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide. *JAMA Ophthalmol*. Published online January 30, 2025. doi:10.1001/jamaophthalmol.2024.6058
[50] *Id*.

right eye. Imaging performed on the right eye was consistent with NAION.

85. A study published on April 7, 2025, analyzing FDA Adverse Event reports indicates increased reports of vision impairment linked to semaglutide use. Compared to other diabetes and weight loss medications, users of semaglutide showed "significantly higher" reports of vision impairment.[51]

86. Despite the growing number of articles, reports, and an investigation by PRAC of the Danish Medicines Agency, Defendants still provide no warnings about the dangerous side effect of NAION in conjunction with use of Ozempic.

**D. Defendants Continue to Fail to Disclose the Risk of NAION and its Sequelae.**

87. According to the Drugs@FDA website, the label for Mounjaro has been updated on at least sixteen (16) occasions since 2022, with the most recent update on January 20, 2026.[52] Despite the fact there are at least seventeen (17) iterations of the Mounjaro label, Defendants' labels have not contained any warning or any information whatsoever on the increased propensity of Mounjaro to cause NAION and permanent vision loss as suffered by Plaintiff.

88. Furthermore, Defendants have failed to take any steps to otherwise warn the medical community, particularly physicians within the ophthalmologic community, to encourage a baseline eye exam prior to starting Mounjaro, monitoring of patients while on the medication, advising patients to cease use of the medication if they develop symptoms consistent with NAION, or after the fact as to not risk the potential for injury in the other eye.

89. Nothing was or is stopping Defendants from adding a warning regarding the risk of

[51] Massy, et al. Increased vision impairment reports linked to semaglutide: analysis of FDA adverse event data, BMC Medicine (2025) 23:203, available at https://bmcmedicine.biomedcentral.com/articles/10.1186/s12916-025-04031-z.

[52] *See* Drugs@FDA: FDA-Approved Drugs, Mounjaro, https://www.accessdata.fda.gov/drugsatfda_docs/label/2026/215866s009lbl.pdf (last visited March 9, 2026).

NAION. Defendants could have at any time made “moderate changes” to the labels.

90. Specifically, Defendants could have filed a “Changes Being Effected” (“CBE”) supplement under Section 314.70(c) of the FDCA to make “moderate changes” to Mounjaro’s label without any prior FDA approval.

91. Examples of moderate label changes that can be made via a CBE supplement explicitly include changes “to reflect newly acquired information” in order to “add or strengthen a contraindication, warning, precaution, or adverse reaction.” By definition and by regulation, such changes to add a warning based on newly acquired information—such as that imparted by newly emerging literature like the litany of studies cited above—are considered a “moderate change.” § 340.70(c)(6)(iii).

92. On July 3, 2024, the Journal of the American Medical Association (“JAMA”) – Ophthalmology published a study suggesting an association between semaglutide and NAION. The study, which evaluated data from December of 2017 through November of 2023, showed that patients with type 2 diabetes taking semaglutide had a more than three times greater risk of developing NAION than those taking non-GLP-1 RA medications. For patients taking semaglutide for overweight/obesity indications, the risk of developing NAION was nearly seven times greater than non-GLP-1 RA medications.[53]

93. The JAMA study referenced a potential causal mechanism, proposing that “expression of the GLP-1 receptor in the human optic nerve and GLP-1 RA induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially

[53] Specifically, the study showed a cumulative incidence of NAION of 8.9% in type 2 diabetes patients taking semaglutide, compared to only 1.8% for patients not taking GLP-1RA medications, with a hazard ratio of 4.28. For overweight/obese patients, the cumulative incidence of NAION was 6.7% for patients taking semaglutide, compared to only 0.8% for those not taking GLP-1RAs, with a hazard ratio of 7.64. Jimena Tatiana Hathaway, et al., Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide, JAMA OPHTHALMOLOGY 2024;142(8):732-739 (published online July 3, 2024), available at https://jamanetwork.com/journals/jamaophthalmology/fullarticle/2820255 (last visited 12/17/2024).

increase the risk of NAION."[54]

94. The FDA's Adverse Events Reporting System (FAERS) shows multiple reports of "Optic Ischaemic Neuropathy" reported in connection with use of GLP-1RAs. The earliest reported Optic Ischaemic Neuropathy event associated with any GLP-1RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[55]

**1. The Sponsor of a Drug is Responsible for Ensuring the Safety of Its Drug and for Warning**

95. The Sponsor of a drug is responsible for the safety of its product.

96. A drug company is responsible for alerting healthcare providers and patients of risks that are unknown or not well understood.

97. The Institute of Medicine has stated that FDA's ability to oversee drug safety is limited, especially after approval of a drug.

98. The Institute of Medicine wrote the following in a report entitled The Future of Drug Safety: Promoting and Protecting the Health of the Public: "The drug safety system is impaired by the following factors: serious resource constraints that weaken the quality and quantity of the science that is brought to bear on drug safety; an organizational culture in CDER (FDA Center for Drug Evaluation and Research) that is not optimally functional; and unclear and insufficient regulatory authorities particularly with respect to enforcement." The Report further stated that "FDA, contrary to its public health mission, and the pharmaceutical industry, contrary to its responsibility to the users of its products (and its shareholders), do not consistently demonstrate accountability and transparency to the public by communicating safety concerns in a timely and effective fashion."

---

[54] *Id.*
[55] The FAERS database is accessible online at https://www.fda.gov/drugs/questions-and-answers-fdas-adverse-event-reporting-system-faers/fda-adverse-event-reporting-system-faers-public-dashboard.

99. The FDA has insufficient resources to monitor the 11,000 drugs on the market.

100. Manufacturers have access to information about their drugs, especially in the post-approval phase as new risks emerge, that is superior to the access that FDA has.

101. Uncommon risks, or those that appear as common conditions, develop after long periods of time, or have adverse impacts on special populations, may go undetected in clinical trials.

102. If a drug company has reason to know the risks of a drug may result in adverse events, even if it develops that knowledge in the post-approval context, that company has a responsibility to investigate those risks and to provide necessary information healthcare providers.

103. The following FDA standards govern a manufacturer's duty to warn: 21 C.F.R. § 201.57(c)(6): Warnings and precautions: "This section must describe clinically significant adverse reactions … the labeling must be revised to include a warning about a clinically significant hazard as soon as there is reasonable evidence of a causal association of a serious hazard with a drug; a causal relationship need not have been definitely established …"

104. In addition, under 21 C.F.R. § 201.57(c)(6), the Warning and Precaution Section of prescription drug labels must "describe clinically significant adverse reactions (including any that are potentially fatal, are serious even if infrequent, or can be prevented or mitigated through appropriate use of the drug), other potential safety hazards …"

105. It is a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times.

106. A manufacturer is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market.

107. According to industry guidance on warnings in labeling from the FDA in 2011,

"The WARNINGS AND PRECAUTIONS section is intended to identify and describe a discrete set of adverse reactions and other potential safety hazards that are serious or are otherwise clinically significant because they have implications for prescribing decisions or for patient management."[56]

108. FDA's Guidance also states, "Adverse reactions that do not meet the definition of a serious adverse reaction, but are otherwise clinically significant because they have implications for prescribing decisions or patient management, should also be included in the WARNINGS AND PRECAUTIONS section."[57]

109. The medical literature discussing gastroparesis describes the distressing nature of the condition and its potential to profoundly limits a person's quality of life.[58]

### 2. Defendants' Marketing of GLP-1 RAs Was Intentionally Deceptive and Misleading and Lacked Fair Balance

110. Defendants' extensive multifaceted advertising, marketing and promotion of GLP-1 RAs consistently highlighted and overstated the weight loss benefits of taking a GLP-1 RA while failing to disclose the risks identified with those drugs and concealing other information that would be material to Plaintiff and their physician in weighing the risks and benefits of taking a GLP-1 RA.

111. Defendants did not disclose the risks of developing NAION and its sequelae.

112. In addition, Defendants intentionally omitted other facts that they knew to be

---

[56] U.S. Dept. of Health & Human Services, Food & Drug Admin., *Guidance for Industry: Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products – Content and Format* (Oct. 2011), at 5, available at https://www.fda.gov/files/drugs/published/Warnings-and-Precautions--Contraindications--and-Boxed-Warning-Sections-of-Labeling-for-Human-Prescription-Drug-and-Biological-Products-%E2%80%94-Content-and-Format.pdf.

[57] *Id*. at 6.

[58] *See generally, e.g.*, Lee et al, *Health-Related Social Needs in Patients With Gastroparesis: Relationships to Symptom Severity and Quality of Life*, 6 GASTRO. HEP. ADV. 48 (2023); Simons & Kline, *Scoping review: the social and emotional impacts of gastroparesis*, TRANSL. GASTROENTEROL. HEPATOL. (2024).

true from their labels, physician communications, marketing, website, public statements, and other public facing communications. These documents omit facts that include: (1) the average person only loses a small percentage of their body weight while on a GLP-1 RA; (2) GLP-1 RAs are not effective for everyone; (3) patients gain the weight back when they stop taking the GLP-1 RA (i.e., patients have to stay on the drug forever); (4) the weight loss achieved while on a GLP-1 RA is not a healthy weight loss; (5) when a patient regains the weight loss achieved while on a GLP-1 RA, they are typically less healthy than when they began the medication; and (6) many people stop taking a GLP-1 RA relatively quickly because of trouble tolerating the drugs. These facts are critical to the balancing of risks and benefits facing most patients.

**a. Average Weight Loss is Modest**

113. Studies show that the real numbers are much lower. Measured across the first 12 weeks of the drug, when most people are on the drug, the numbers are closer to 3.6% to 5.9% of body weight.[59] On July 8, 2024, a JAMA Internal Medicine article suggested that both Novo and Lilly overstated the weight loss benefits of their drug in advertisements. Over a year's time, those on tirzepatide (Mounjaro/Zepbound) lost an average of 15.3% of their body weight compared to 8.3% for semaglutide (Ozempic/Wegovy) users. Only 18% of those on semaglutide reported a weight loss of at least 15% of their body weight after one year of treatment.[60] More importantly, Novo's claim that their drugs create lasting weight loss are also misleading: their own data shows that only 9.4% of patients on the highest dose available sustain weight loss over a four-year period.[61]

---

[59] *See* https://www.wegovy.com/aboutwegovy/why-wegovy.html for Novo Nordisk and https://zepbound.lilly.com/ for Lilly.

[60] Rodriguez et al., *Semaglutide vs Tirzepatide for Weight Loss in Adults With Overweight or Obesity*, 184(9) JAMA INTERN. MED. 1056–64 (2024), doi:10.1001/jamainternmed.2024.2525, available at https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2821080.

[61] Novo Nordisk, *Obesity care*, CMD24: Capital Markets Day (Mar. 7, 2024), available at https://www.novonordisk.com/content/dam/nncorp/global/en/investors/irmaterial/cmd/2024/P5-Obesity-Care.pdf.

**b. Non-Responders**

114. Some research suggests that patients taking semaglutide (i.e., Ozempic and Wegovy) "found about 14% of patients lost less than 5% of their body weight and one-third lost less than 10%" while a separate trial focused on tirzepatide (Mounjaro and Zepbound) "demonstrated similar results."[62] Notably, the article discussing the research states that "Wegovy and Zepbound have been approved by the FDA for weight loss, while Ozempic and Mounjaro have been prescribed for that purpose in an off-label fashion."

**c. Patients Must Remain on the Drug to Sustain Weight Loss**

115. For those who lose weight, they typically need to stay on the drug forever to maintain the weight loss.[63] A Medscape article from March of 2024 explains that when "patients stop taking GLP-1s, they tend to regain most of that weight within a year, studies showed."[64]

116. Novo has publicly recognized that most individuals will regain all the weight back within five years of stopping Ozempic or Wegovy.[65] A trial published by Novo showed that, after a year, participants had gained back two thirds of the weight lost after they stopped taking semaglutide.[66] Indeed, Novo has acknowledged that some individuals will regain even more weight after stopping Ozempic or Wegovy than they initially lost.[67]

---

[62] Carbajal, Erica, *Up to 15% of patients on weight loss drugs may be 'non-responders*, BECKER'S HOSPITAL REV. (April 1, 2024) available at https://www.beckershospitalreview.com/glp-1s/upto-15-of-patients-on-weight-loss-drugs-non-responders.html.

[63] M. Karth, *Is Semaglutide a Miracle Weight-Loss Drug?*, PSYCHOLOGY TODAY (Apr. 1, 2023), available at https://www.psychologytoday.com/ie/blog/the-neuroscience-of-eating-disorders/202303/ozempic-and-wegovy-is-semaglutide-a-miracle-weight.

[64] Julie Stewart, *Help Patients Prevent Weight Gain After Stopping GLP-1s*, MEDSCAPE MED. NEWS (Mar. 18, 2024), available at https://www.medscape.com/viewarticle/help-patients-prevent-weightgain-after-stopping-glp-1s-2024a10004z9?form=fpf.

[65] A. Constantino, *People taking obesity drugs Ozempic and Wegovy gain weight once they stop medication*, CNBC (Mar. 29, 2023), available at https://www.cnbc.com/2023/03/29/people-taking-obesity-drugs-ozempic-and-wegovy-gain-weight-once-they-stop-medication.html.

[66] Wilding et al., *Weight regain and cardiometabolic effects after withdrawal of semaglutide: The STEP 1 trial extension*, 24(8) DIABETES OBES METAB. 1553-64 (2022), doi:10.1111/dom.14725, available at https://dom-pubs.onlinelibrary.wiley.com/doi/10.1111/dom.14725.

[67] A. Constantino, *People taking obesity drugs Ozempic and Wegovy gain weight once they stop medication*, CNBC

117. As noted by Novo's Martin Holst Lange: "once the majority of the weight loss is accrued, you don't go back and start to increase in weight if you stay on the drug."[68]

118. Wegovy and Ozempic are often marketed as part of a "metabolic reset"[69] even though studies show that weight will be regained upon cessation and even though it has been widely recognized that GLP-1 RAs do not rewire "your neural networks to really define a new body weight setpoint."[70] Not only is it not a "reset," but some patients will actually regain even more weight after stopping the drug.[71]

119. This was consistent with Lilly's sponsored SURMOUNT-4 study of tirzepatide, which showed that patients regained 14% of their body weight after switching from tirzepatide to a placebo.[72] On average, patients were able to maintain only about 10% of the weight they lost from the time they started taking tirzepatide.[73] Notably, the trend towards weigh regain was on clear upward trajectory at the study endpoint, suggesting patients who had ceased taking the drug would continue to regain weight over time.

120. A meta-analysis of GLP-1 RA clinical trials found that "several GLP-1 RAs showed a gradual decline in effects on body weight throughout the long term intervention. In comparison to placebo, semaglutide resulted in a reduction of body weight from a mean difference of −3.28 kg (95% confidence interval −4.20 to −2.37) with medium term intervention to −2.75 kg

(Mar. 29, 2023), available at https://www.cnbc.com/2023/03/29/people-taking-obesity-drugs-ozempic-and-wegovy-gain-weight-once-they-stop-medication.html.

[68] K. Kindelan, *New study focuses on what happens if you stay on weight loss drug Wegovy for years*, ABC NEWS (May 20, 2024), available at https://abcnews.go.com/GMA/Wellness/new-study-focuses-stay-weight-loss-drug-wegovy/story?id=110401021 (emphasis added).

[69] Calibrate, *How long does it take to lose weight on Ozempic?* (Jun. 5, 2022), available at https://www.joincalibrate.com/resources/how-long-does-it-take-to-lose-weight-on-ozempic.

[70] A. Constantino, *People taking obesity drugs Ozempic and Wegovy gain weight once they stop medication*, CNBC (Mar. 29, 2023), available at https://www.cnbc.com/2023/03/29/people-taking-obesity-drugs-ozempic-and-wegovy-gain-weight-once-they-stop-medication.html.

[71] *Id.*

[72] Arone et al., *Continued Treatment With Tirzepatide for Maintenance of Weight Reduction in Adults With Obesity: the SURMOUNT-4 Randomized Clinical Trial*, 331 JAMA 38 (2023).

[73] *Id.* at 45.

(−4.60 to −0.89) with long term intervention. Liraglutide and dulaglutide also showed a similar trend."[74]

**d. Not a Healthy Weight Loss**

121. Taking GLP-1s may actually result in patients being less healthy. Defendants fully understand that overall health is more than a number, whether that number is purely weight or BMI. Despite this, the focus of prescribing GLP-1 RAs for obesity is on a person's BMI and to the extent that BMI is less than 30, whether they also have a weight-related health condition (i.e., cardiovascular disease, etc.).

122. As previously noted, BMI is a simple calculation that includes only weight and height. This poses limitations for its usefulness on an individual basis, rather than a population basis. For example, Jalen Hurts, Quarterback of the Philadelphia Eagles, is 6 feet and 1 inch tall and weighs 223 pounds, putting his BMI at 29.4 and making him extremely overweight and borderline obese if considering BMI alone. However, this does not account for the fact that he is an elite athlete with a body fat percentage under 10 percent. Nonetheless, if he suffers additional health condition or gains 5 pounds (or simply says he weighs 5 pounds more during a telehealth visit), he would qualify for one of the Defendants' weight loss drugs.

123. Because of these obvious limitations of BMI, the AMA has urged doctors to deemphasize their use of BMI in determining healthy weights for patients.[75] On June 14, 2023, the AMA adopted a new policy clarifying how BMI should be used as a measure in medicine.[76] The AMA suggests that BMI be used in conjunction with other valid measures of risk such as, but not

---

[74] Yao et al., *Comparative effectiveness of GLP-1 receptor agonists on glycaemic control, body weight, and lipid profile for type 2 diabetes: systematic review and network meta-analysis*, BMJ OPEN 8 (2023).
[75] *Id.*
[76] AMA, *AMA adopts new policy clarifying role of BMI as a measure in medicine* (Jun. 14, 2023), available at https://www.ama-assn.org/press-center/press-releases/ama-adopts-new-policy-clarifying-role-bmi-measure-medicine.

limited to, measurements of visceral fat, body adiposity index, body composition, relative fat mass, waist circumference and genetic/metabolic factors.[77]

124. Weight loss as the sole indicator of health has also been rejected by many clinicians in favor of improvements in other health outcomes and the assess the whole health of an individual.[78] These clinicians have cautioned that "a lower body weight does not always mean a person is healthier."[79] In many instances, when someone loses weight, they lose fat (a good result), but also lose muscle mass (bad).

125. It is recognized in the medical community that weight loss achieved by Ozempic and Wegovy is often a result of a significant loss of muscle mass.[80] As a result, individuals may be lighter than they were initially but have a higher percentage of body fat.[81]

126. To further exacerbate the problem, if patients stop taking a GLP-1 RA and regain weight, as discussed above, that weight gain is typically not adding muscle but instead adding fat. Therefore, the resulting "new you" is less healthy—weighing the same but having a higher percentage of body fat.

127. The loss of too much muscle mass can lead to sarcopenia, a condition called being "skinny fat," in which the patient has decreased muscle mass, lessened bone density, and lower resting metabolic rate—all of which results in a loss of strength and functionality.[82]

---

[77] *Id.*

[78] Hagan & Nelson, *Are Current Guidelines Perpetuating Weight Stigma? A Weight-Skeptical Approach to the Care of Patients with Obesity*, 38(3) J. GEN. INTERN. MED. 793–8 (Sept. 2022), available at https://link.springer.com/content/pdf/10.1007/s11606-022-07821-w.pdf?pdf=button; *Why body mass index doesn't give the whole health picture*, UW Medicine Newsroom (Jun. 20, 2023), available at https://newsroom.uw.edu/video-library/why-body-mass-index-doesnt-give-the-whole-health-picture.

[79] C. Cassata, *Ozempic Can Cause Major Loss of Muscle Mass and Reduce Bone Density*, HEALTHLINE (May 2, 2023), available at https://www.healthline.com/health-news/ozempic-muscle-mass-loss.

[80] K. Sullivan, *Weight loss drugs can lead to muscle loss, too. Is that a bad thing?*, NBC News (May 20, 2023), available at https://www.nbcnews.com/health/health-news/weight-loss-drugs-muscle-loss-rcna84936.

[81] J. Margo, *The alarming twist when using Ozempic for weight loss*, THE AUSTRALIAN FINANCIAL REVIEW (Jul. 21, 2023), available at https://www.afr.com/policy/health-and-education/lighter-but-fatter-the-ozempic-paradox-20230718-p5dp5w.

[82] C. Cassata, *Ozempic Can Cause Major Loss of Muscle Mass and Reduce Bone Density*, HEALTHLINE (May 2,

128. Lilly recognizes that much of the weight loss is actually healthy muscle tissue, but rather than warn consumers that most of the weight loss on tirzepatide will be muscle loss, Lilly has instead invested in developing combination drugs to combat the muscle loss.[83]

129. Defendants did not warn about the dangers of the type of unhealthy weight loss occurring with GLP-1 RAs. Novo personnel refer to weight loss resulting from Wegovy as a "healthy" weight loss.[84] At the same time, Novo told investors: "Healthy weight loss is, I don't want to call it the next frontier. But it is certainly important … There is a risk if you do introduce very fast and dramatic weight loss you will lose almost 50-50 lean body mass and fat mass. So the tempered but consistent body weight loss could potentially be healthier than a very dramatic fast weight loss."[85] Novo also stated that reasonable preservation of lean body mass "has to be a focus area, and you will probably see [it] in our pipeline."[86]

130. Similarly for Lilly, it was a "big investor question around [the] muscle issue"[87] and Lilly knew that "the quality of weight loss" mattered.[88] Lilly recognized that there could be some patients who "could benefit from both weight loss and maybe more muscle," hence why Lilly was investing in further research on products that would prevent muscle loss.[89]

131. Because Defendants do not warn of or disclose the type of weight loss occurring with GLP-1 RAs, patients do not factor that into their analysis of risks and benefits when considering taking a GLP-1 RA and are not aware that they should take specific steps to mitigate

2023), available at https://www.healthline.com/health-news/ozempic-muscle-mass-loss.
[83] Dani Blum, *The Race Is On to Stop Ozempic Muscle Loss*, NEW YORK TIMES (Feb. 8, 2024), available at https://www.nytimes.com/2024/02/08/well/live/ozempic-muscle-loss-exercise.html.
[84] A. Pawlowski, *Is it safe to take the anti-obesity drug Wegovy long-term? Doctors weigh in*, TODAY (Jan. 25, 2023), available at https://www.today.com/health/diet-fitness/is-wegovy-safe-for-weight-loss-rcna67277.
[85] *See* 2022-11-03 Q3 Earnings Call.
[86] *Id*.
[87] 20231128 Evercore ISI 6th Annual HealthCONx Conference.
[88] 2024430 Q1 2024 Earnings Call.
[89] 20231128 Evercore ISI 6th Annual HealthCONx Conference.

this muscle loss, like dietary changes and strength training.[90]

**e. Many Patients Do Not Stay on the Drugs Long Enough to See Benefits.**

132. Approximately 58% of patients stop taking a GLP-1 RA within 12 weeks, and 30 percent stop in the first 4 weeks. In May of 2024, Blue Cross Blue Shield published "Real-World Trends in GLP-1 Treatment Persistence and Prescribing for Weight Management" noting these statistics.[91] This means that "[the] value [GLP-1 RA treatment] is not likely to be realized" in most patients.[92]

133. This is perhaps caused by the fact that side effects are most likely to present themselves in the first 12 weeks of use as the dosage increases. Lilly itself has noted that the risks of the medicine are often seen within just 12 weeks of use as patients are escalating the dosage up.[93] Physicians also recognize that adverse events are also more likely to occur during dose escalation with Ozempic and Wegovy.[94]

134. Neither Novo or Lilly warns or highlights that most people are unable to tolerate the drug and stay on it long enough for it to make a meaningful difference. These are clear indications that could impact a patient's decision to take a GLP-1 RA.

135. Federal regulators have raised misleading promotional, marketing and advertising materials with Novo and Lilly (the OPDP's March 14, 2008 letter was previously discussed):

---

[90] J. Margo, *The alarming twist when using Ozempic for weight loss*, THE AUSTRALIAN FINANCIAL REVIEW (Jul. 21, 2023), available at https://www.afr.com/policy/health-and-education/lighter-but-fatter-the-ozempic-paradox-20230718-p5dp5w.

[91] Blue Health Intelligence, *Real-World Trends in GLP-1 Treatment Persistence and Prescribing for Weight Management*, Issue Brief (May 2024), available at https://www.bcbs.com/media/pdf/BHI_Issue_Brief_GLP1_Trends.pdf.

[92] Gleason et al., *Real-world persistence and adherence to glucagon-like peptide-1 receptor agonists among obese commercially insured adults without diabetes*, 30 JMCP 2 (2024).

[93] D. Ovalle et al., *Patients grapple with side effects of popular weight-loss drugs*, THE WASHINGTON POST (Aug. 8, 2023), available at https://www.washingtonpost.com/health/2023/08/08/weight-loss-drugs-side-effects-wegovy-ozempic/.

[94] Braxton Medical Clinic, *Understanding the Side Effects of Semaglutide and Tirzepatide* (Jun. 2, 2024), available at https://www.braxtonmedicalclinic.com/post/understanding-the-side-effects-of-semaglutide-and-tirzepatide-a-comprehensive-guide-for-patients-of.

136. On September 23, 2021, Health and Human Services ("HHS") issued a response letter to Novo regarding Wegovy's misleading statements and that fact that it was minimizing the risk of nausea.[95]

137. In a June 1, 2015 letter to Lilly related to a proposed print advertisement, the OPDP remarked that Lilly "downplays the risk of nausea experienced in clinical trials."

138. In the same 2015 letter, the OPDP said that the promotional materials "misleadingly" implied that Trulicity was indicated for weight-loss and that patients would see substantial loss in weight. While these promotional materials did contain some language in small print that Trulicity was "not indicated for weight loss," the OPDP found that the inclusion of such disclosures did not "mitigate the overwhelmingly powerful weight loss claims and presentations conveyed in the proposed detailed aid."

139. A mere 3 months later, on September 16, 2014, the FDA wrote again, finding many significant issues related to Trulicity marketing. In addition to repeated comments about minimization of risk and overstatement of efficacy, this time the OPDP noted that Lilly's marketing materials were broadening the patient population for Trulicity. Indeed, the OPDP wrote that Lilly's marketing was "misleading because they suggest that Trulicity is useful in a broader range of patients or conditions than has been demonstrated by substantial evidence." In a January 30, 2018 letter to Lilly, the OPDP repeated its concerns about the "Net impression" of the Trulicity marketing, specifically regarding the prominence and readability of the small print text in the ads, and referring to letters from 2015, 2016 and 2017 as to this point.

140. A February 12, 2019 letter from OPDP to Lilly repeated the concern about the small print text at the bottom of the commercials.

---

[95] OPDP Letter, Sept. 23, 2021 (Novo_GLP_MDL_WEG_NDA_000531088).

141. In a December 17, 2020 letter to Lilly, the OPDP found that Lilly was creating a "misleading impression" that Trulicity was indicated for "weight loss."

142. Specifically, the OPDO found that Lilly was omitting information that patients were receiving additional medications during the trials which showed weight loss. The OPDO found that the "omission of this information undermines the ability of the viewer to understand and evaluate the efficacy claims presented in the proposed TV Ad."

## EQUITABLE TOLLING OF STATUTE OF LIMITATIONS

143. Defendants are estopped from relying on the statute of limitations defense because Defendants actively concealed information concerning known risks, side effects, and defects in their GLP-1 RA Products. Instead of revealing such information to the FDA or the public, Defendants have continued to represent their GLP-1 RA Products as safe for their intended use.

144. Defendants are and were under a continuing duty to disclose the true character, quality and nature of risks and dangers associated with their GLP-1 RA Products. Because of Defendants' purposeful and fraudulent concealment of material information concerning the true character, quality and nature of risks of their GLP-1 RA Products, Defendants are estopped from relying on any statute of limitations defense.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENT FAILURE TO WARN
### (AGAINST ALL DEFENDANTS)

145. Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

146. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing,

and/or promoting Mounjaro and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

147. Defendants, as the holder of the NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

148. Mounjaro was expected to reach, and did reach, users and/or consumers, including Plaintiff, without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

149. Defendants owed Plaintiff and other Mounjaro users a duty to exercise reasonable care in marketing, advertising, promoting, distributing and/or selling Mounjaro.

150. At all times material, Mounjaro was used in a manner intended and/or foreseeable to Defendants.

151. A reasonable patient or consumer of Mounjaro would expect the drug to be free of significant defects.

152. Defendants knew or had reason to know of facts establishing that Mounjaro could cause NAION and failed to warn of the risk.

153. At all times relevant hereto, the defective nature of Mounjaro was known to Defendants, or reasonably and scientifically knowable to them, through appropriate research and testing by known methods, at the time they distributed, supplied, or sold Mounjaro, and not known to ordinary physicians who would be expected to prescribe the drug to their patients.

154. In disregard of its duty to timely warn consumers of health risks associated with Mounjaro, Defendants committed one or more of the following negligent acts or omissions:

a. Failing to properly and adequately warn and instruct Plaintiff and Plaintiff's treating physicians that Mounjaro was designed and/or manufactured in a way that it could cause injuries and damages, including permanent vision loss;

b. Failing to timely disclose to Plaintiff and Plaintiff's prescribing and treating physicians the risk of NAION;

c. Failing to timely warn Plaintiff and Plaintiff's physicians that a base line eye exam should be performed and monitoring was necessary.

155. At all relevant times, the label for Mounjaro was inadequate because it did not warn and/or adequately warn of all possible adverse side effects of NAION and permanent vision loss.

156. At all relevant times, the label for Mounjaro was inadequate because it did not warn and/or adequately warn that Mounjaro had not been sufficiently and/or adequately tested for safety risks, including NAION.

157. The labels for Mounjaro were inadequate because they did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Mounjaro.

158. Defendants' failure to warn of the above was the proximate cause of Plaintiff's injuries, harm, and economic loss, from which Plaintiff continues to suffer.

159. Defendants' failure to warn of the significant risks of Mounjaro use prevented Plaintiff and Plaintiff's treating physicians from conducting a proper assessment of the risks and benefits of using Mounjaro.

160. Had Plaintiff and/or Plaintiff's treating physicians been properly warned of the significant risks of Mounjaro, Plaintiff would not have elected to begin and/or continue Mounjaro.

161. Reasonable, safer alternative treatments were available to Plaintiff and/or Plaintiff's treating physicians had they been warned of these significant risks outlined herein.

162. As a direct and proximate result of Defendants' conduct, including the inadequate

warnings, lack of adequate testing and research, and the defective and dangerous nature of Mounjaro, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT II
## NEGLIGENCE
## (AGAINST ALL DEFENDANTS)

163. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

164. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Mounjaro and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

165. Defendants, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

166. At all relevant times, Defendants had a duty to exercise reasonable care in the

manufacture, design, marketing, advertisement, supply, storage, transport, packaging, sale, and distribution of Mounjaro products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that did not cause users to suffer from unreasonable, dangerous side effects without an adequate warning—when used alone or in foreseeable combination with other drugs.

167. Defendants failed to exercise ordinary care in the labeling, design, manufacturing, testing, marketing, distribution and/or sale of Mounjaro in that Defendant knew or should have known these drugs created a high risk of unreasonable harm to Plaintiff and other users.

168. Defendants had no reason to believe that intended and foreseeable users of Mounjaro, such as Plaintiff, would realize the potential harm from use of these products.

169. Defendants failed to exercise reasonable care to inform users, such as Plaintiff, of Mounjaro's risk of serious and potentially irreversible vision issues and harm to the optic nerve.

170. Defendants breached their duty of care to the Plaintiff and Plaintiff's physicians, in the testing, monitoring, and pharmacovigilance of Mounjaro.

171. In disregard of its duty, Defendants committed one or more of the following negligent acts or omissions:

a. Manufacturing, producing, overpromoting, formulating, creating, developing, designing, selling, and distributing Mounjaro without thorough and adequate pre- and post-market testing of the products;

b. Manufacturing, producing, overpromoting, advertising, formulating, creating, developing, and designing, and distributing Mounjaro while negligently and intentionally concealing and failing to disclose clinical data which demonstrated the risk of serious harm associated with the use of Mounjaro;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Mounjaro was safe for their intended use;

d. Failing to disclose and warn of the product defect to the medical community, and consumers that Defendants knew and had reason to know that Mounjaro was indeed unreasonably unsafe and unfit for use by reason of the product defects and risk of harm to its users;

e. Failing to warn Plaintiff, the medical and healthcare community, and consumers that the Mounjaro's risk of harm was unreasonable and that there were safer and effective alternative products available to Plaintiff and other consumers;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons to whom it was reasonably foreseeable would use Mounjaro;

g. Advertising, marketing, and recommending the use of Mounjaro, while concealing and failing to disclose or warn of the dangers known by Defendants to be connected with, and inherent in, the use of this product;

h. Representing that Mounjaro was safe for its intended use when in fact Defendants knew and should have known the product were not safe for their intended purpose;

i. Continuing to manufacture and sell Mounjaro with the knowledge that Mounjaro is unreasonably unsafe and dangerous;

j. Failing to use reasonable and prudent care in the design, research, testing, manufacture, and development of Mounjaro so as to avoid the risk of serious harm associated with the use of tirzepatide. Failing to design and manufacture Mounjaro so as to ensure these drugs were at least as safe and effective as other similar products;

k. Failing to design and manufacture Mounjaro was reasonably safe for their intended purpose in violation of objective safety standards;

l. Failing to ensure that Mounjaro were accompanied by proper and accurate warnings about requiring baseline visual examinations and regular eye examinations while using the drug;

m. Failing to ensure that Mounjaro were accompanied by proper and accurate warnings about possible adverse side effects associated with the use of Mounjaro and that use of tirzepatide created a high risk of severe, permanent injuries to vision; and

n. Failing to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance to determine the safety of

Mounjaro.

172. A reasonable manufacturer, designer, distributor, promotor, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

173. As a direct and proximate result of the Defendants' negligent testing, monitoring, and pharmacovigilance of Mounjaro, Defendants introduced products they knew or should have known would cause injury to the optic nerve, NAION and resulting serious and permanent injuries to an individual's vision, and Plaintiff has been injured catastrophically and sustained severe and permanent pain, suffering, disability, and impairment, loss of enjoyment of life, loss of care, comfort, and economic damages.

174. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Mounjaro, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT III**
**NEGLIGENT MISREPRESENTATION AND MARKETING**
**(AGAINST ALL DEFENDANTS)**

175. Plaintiff incorporates by reference each and every preceding paragraph as though

fully set forth herein.

176. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Mounjaro and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

177. Defendants, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

178. At all relevant times, Defendants negligently provided Plaintiff, Plaintiff's healthcare providers, and the general medical community with false or incorrect information or omitted or failed to disclose material information concerning Mounjaro, including, but not limited to, misrepresentations regarding the safety and known risks of Mounjaro.

179. The information distributed by the Defendants to the public, the medical community, Plaintiff and Plaintiffs' healthcare providers, including advertising campaigns, labeling materials, print advertisements, commercial media, was false and misleading and contained omissions and concealment of truth about the dangers of Mounjaro.

180. Defendants' conduct had the capacity to deceive and/or purpose in making these misrepresentations was to deceive and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Mounjaro and induce the public and medical community, including Plaintiff and Plaintiff's healthcare providers to request, recommend, purchase, and prescribe Mounjaro.

181. Defendants' intent and purpose in making these misrepresentations was to deceive

and defraud the public and the medical community, including Plaintiff and Plaintiff's health care providers; to falsely assure them of the quality of Mounjaro and induce the public and medical community, including Plaintiff and Plaintiff's healthcare provider to request, recommend, purchase, and prescribe Mounjaro.

182. Defendants had a duty to accurately and truthfully represent and market to the medical and healthcare community, Plaintiff, Plaintiff's healthcare providers and the public, the known risks of Mounjaro, including its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

183. Defendants made continued omissions in the Mounjaro labeling, including promoting it as safe and effective while failing to warn of its propensity to cause permanent vision loss, NAION and injury to the optic nerve.

184. Defendants made additional misrepresentations beyond the product labeling by representing Mounjaro as a safe and effective treatment for type 2 diabetes with only minimal risks.

185. Defendants misrepresented and overstated the benefits of Mounjaro to Plaintiff, Plaintiff's treaters, and the medical community without properly advising of the known risks to permanent vision loss.

186. In reliance upon the false and negligent misrepresentations and omissions made by the Defendants, Plaintiff and Plaintiff's healthcare providers were induced to, and did use Mounjaro, thereby causing Plaintiff to endure severe and permanent injuries.

187. In reliance upon the false and negligent misrepresentations and omissions made by the Defendants, Plaintiff and Plaintiff's healthcare providers were unable to associate the injuries sustained by Plaintiff with Plaintiff's Mounjaro use before it was too late. Defendants knew or

should have known that the Plaintiff, Plaintiff's healthcare providers, and the general medical community did not have the ability to determine the true facts which were intentionally and/or negligently concealed and misrepresented by the Defendants.

188. Plaintiff and Plaintiff's healthcare providers would not have used or prescribed Mounjaro had the true facts not been concealed by the Defendants.

189. Defendants had sole access to many of the material facts concerning the defective nature of Mounjaro and its propensity to cause serious and dangerous side effects.

190. At the time Plaintiff was prescribed and administered Mounjaro, Plaintiff and Plaintiff's healthcare providers were unaware of Defendants' negligent misrepresentations and omissions.

191. The Defendants failed to exercise ordinary care in making representations concerning Mounjaro while they were involved in their manufacture, design, sale, testing, quality assurance, quality control, promotion, marketing, labeling, and distribution in interstate commerce, because the Defendants negligently misrepresented Mounjaro's risk of unreasonable and dangerous adverse side effects.

192. Plaintiff and Plaintiff's healthcare providers reasonably relied upon the misrepresentations and omissions made by the Defendants, where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of the Mounjaro.

193. Plaintiff and Plaintiff's healthcare providers' reliance on the foregoing misrepresentations and omissions was the direct and proximate cause of Plaintiff's injuries.

194. As a direct and proximate result of reliance upon Defendants' negligent misrepresentations, Plaintiff suffered bodily injury and resulting pain and suffering, disability,

mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

**WHEREFORE,** Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT IV
## BREACH OF EXPRESS WARRANTY
## (AGAINST ALL DEFENDANTS)

195. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

196. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Mounjaro and placed this drug into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

197. Defendants, as the holder of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

198. Defendants expressly warranted to Plaintiff, Plaintiff's healthcare providers, and the general public, by and through Defendants and/or their authorized agents or sales representatives, in publications, labeling, the internet, and other communications intended for physicians, patients, Plaintiff, and the general public, that Mounjaro was safe, effective, fit and

proper for its intended use.

199. Mounjaro materially failed to conform to those representations made by Defendants, in package inserts and otherwise, concerning the properties and effects of Mounjaro, which Plaintiff purchased and injected in direct or indirect reliance upon these express representations. Such failures by Defendants constituted a material breach of express warranties made, directly or indirectly, to Plaintiff concerning Mounjaro sold to Plaintiff.

200. Defendants expressly warranted that Mounjaro was safe and well-tolerated. However, Defendants did not have adequate proof upon which to base such representations, and, in fact, knew or should have known that Mounjaro was particularly dangerous to the well-being of Plaintiff and Plaintiff's vision.

201. Mounjaro does not conform to those express representations because they are defective, not safe, and have serious adverse side effects.

202. Plaintiff and Plaintiff's physicians justifiably relied on Defendants' representations regarding the safety of Mounjaro, and Defendants' representations became part of the basis of the bargain.

203. Plaintiff and Plaintiff's healthcare providers justifiably relied on Defendants' representations that Mounjaro was safe and well-tolerated in their decision to ultimately prescribe, purchase and use the drug.

204. Plaintiff's healthcare providers justifiably relied on Defendants' representations through Defendants' marketing and sales representatives in deciding to prescribe Mounjaro over other alternative treatments on the market, and Plaintiff justifiably relied on Defendants' representations in deciding to purchase and use the drug.

205. Plaintiff purchased and used Mounjaro without knowing that drug is not safe and

well-tolerated, but that Mounjaro instead causes significant and irreparable vision loss and eye damage.

206. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Mounjaro, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

**WHEREFORE,** Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## COUNT V
## BREACH OF IMPLIED WARRANTY
## (AGAINST ALL DEFENDANTS)

207. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

208. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Mounjaro, and placed it into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

209. Defendants, as the holder of NDA, are responsible for communications to the FDA

and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance and pharmacovigilance.

210. Defendants were the seller of Mounjaro and sold Mounjaro to be taken for treatment of type 2 diabetes.

211. When Mounjaro was prescribed by Plaintiff's physician and taken by Plaintiff, the product was being prescribed and used for the ordinary purpose for which it was intended.

212. Defendants impliedly warranted their product, which they manufactured and/or distributed and sold, and which Plaintiff purchased and used, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

213. Defendants breached their implied warranties of the Mounjaro product because the Mounjaro sold to Plaintiff was not fit for its ordinary purpose to help improve blood sugar (glucose).

214. Mounjaro would not pass without objection in the trade; they are not of fair average quality; they are not fit for their ordinary purposes for which the products are used; were not adequately contained, packaged and labeled; and fail to conform to the promises or affirmations of fact made on the container or label.

215. Defendants' breach of their implied warranties resulted in use of the unreasonably dangerous and defective product by Plaintiff, which placed Plaintiff's health and safety at risk and resulted in the damages alleged herein.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**COUNT VI**
**NEGLIGENT DESIGN**
**(AGAINST ALL DEFENDANTS)**

216. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

217. Defendants are liable to Plaintiff for the injuries and damages sustained due to Defendants' negligent design and/or formulation of Mounjaro.

218. At all relevant times, Defendants owed a duty to consumers, including Plaintiff and Plaintiff's health care providers, to assess, manage, and communicate the risks, dangers, and adverse effects of Mounjaro. Defendants' duties included, but were not limited to, carefully and properly designing, testing, studying, and manufacturing Mounjaro.

219. Defendants negligently and carelessly breached the above-described duties to Plaintiff by, among other acts and omissions, negligently and carelessly:

a. Failing to use ordinary care in designing, testing, and manufacturing Mounjaro;

b. Failing to design Mounjaro as to properly minimize the adverse effects to the eyes and optic nerve;

c. Failing to counteract in the design the known adverse effects on the eyes and optic nerve;

d. Designing a product where the benefits was greatly outweighed by the risks, including NAION and its sequelae; and

e. Designing a product without taking into consideration the proper dosage that could avoid NAION and its sequelae.

220. Mounjaro was defective in design or formulation in that, when it left the hands of the manufacturers and/or suppliers and/or distributors, the foreseeable risks exceeded the benefits associated with the design or formulation.

221. At all relevant times, given its lack of efficacy and increased safety risks, Mounjaro did not meet the reasonable expectation of an ordinary consumer, particularly the

Plaintiff, or in the alternative, Plaintiff's medical providers.

222. Mounjaro was defective in design or formulation in that, when it left the hands of the manufacturers and/or suppliers and/or distributors, it was unreasonably dangerous, more dangerous than an ordinary consumer would expect, and more dangerous than other similar drugs.

223. Despite Defendants' knowledge of the foreseeable risks and unreasonably dangerous nature of Mounjaro, at all relevant times, Defendants designed and brought the product to market and continued to market the drug when there were safer alternatives available, including but not limited to alternate dosing and reduced exposure.

224. As a direct and proximate result of one or more of the foregoing negligent acts and omissions by Defendants, Plaintiff was caused to suffer serious and dangerous injuries including NAION and its sequelae, which resulted in other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above-named health consequences.

225. As a direct and proximate result of one or more of the foregoing negligent acts and omissions by Defendants, Plaintiff has also suffered consequent economic and other losses, including pain and suffering, loss of a normal life, medical expenses, lost income and disability, and punitive damages. Plaintiff is informed and believes and further alleges that he will require future medical and/or hospital care, attention, and services.

**WHEREFORE**, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants on each of the above referenced claims and Causes of Action and as follows:

1. Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, pain and suffering for severe personal injuries sustained by Plaintiff, health care costs, and medical monitoring, together with interest and costs as provided by law;

2. Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of Defendants, who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

3. Awarding Plaintiff the costs of these proceedings; and

4. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all the triable issues within this pleading.

Dated: October 9, 2026 RESPECTFULLY SUBMITTED,

*/s/ Sarah S. Ruane*

Sarah S. Ruane (*Admitted Pro Hac Vice)*
WAGSTAFF & CARTMELL LLP
4740 Grand Ave., Ste 300
Kansas City, MO 64112
Tel: 816-701-1100
Fax: 816-531-2372
sruane@wcllp.com

**Attorneys for Plaintiff**